**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**JACQUELINE FLEMING,**

                              **Plaintiff,**                    **02-CV-0934C(Sr)**

**v.**

**DEACONESS HOSPITAL,**

                              **Defendant.**

## REPORT, RECOMMENDATION AND ORDER

        This matter was referred to the undersigned by the Hon. Richard J.

Arcara, in accordance with 28 U.S.C. § 636(b), for all pretrial matters and to hear and

report upon dispositive motions.  Dkt. #6.  Subsequently, the matter was transferred to

the Hon. John T. Curtin.  Dkt. #10.

        Plaintiff, acting *pro se*, commenced this action on December 24, 2002, by

filing a Complaint pursuant to Title VII of the Civil Rights Act of 1994 ("Title VII"), as

amended, 42 U.S.C. § 2000e *et seq*., alleging that she was subjected to sexual

harassment, retaliation, and termination of her employment.  Dkt. #1.  Plaintiff's

complaint also asserts a cause of action pursuant to Title 42 U.S.C. § 1981.  Dkt. #1.

Plaintiff retained counsel in the Fall of 2003.

        Currently before the Court are the defendant's motions for a protective

order and summary judgment (Dkt. ##58, 64), and plaintiff's motion for an extension of

time to complete discovery.  Dkt. #61.  Defendant's motion  for a protective order (Dkt.

#58), and plaintiff's motion for an extension of time to complete discovery (Dkt. #61),

are denied as moot in a separate Decision and Order.  For the following reasons, it is

recommended that defendant's motion for summary judgment (Dkt. #64), be granted.

## BACKGROUND

Plaintiff commenced employment with Deaconess Hospital as a Certified Nurses Assistant on February 14, 2000. Dkt. #65, ¶ 2.[1]

As part of the Kaleida Health System, employees at Deaconess Hospital were subject to a Time and Attendance Policy, which was incorporated into the master collective bargaining agreement between Kaleida and the Service Employees' International Union, Local 1199 Upstate, AFL-CIO ("Union"), of which plaintiff was a member.  Dkt. #65, ¶¶ 3, 22.  The Time and Attendance Policy provides that employees incurring more than six unscheduled absences per calendar year are subject to progressive discipline, *to wit*, a first verbal warning upon the seventh absence; a second verbal warning upon the eighth absence; a written warning upon the ninth absence; a two-day suspension without pay upon the tenth absence; and suspension pending administrative review for discharge for any further absences.  Dkt. #65, ¶ 24.  Unit managers administer the policy until the tenth absence, at which point the Human Resources Department must approve an employee's suspension or termination.  Dkt. #65, ¶ 26.  Sixteen employees were terminated for attendance violations in 2001.  Dkt. #65, ¶ 45.

In 2000, plaintiff received written warnings for her absences on September 24, 2000 and December 21, 2000.  Dkt. #66, p.112; Dkt. #66-3, p.2.  The December 21, 2000 warning followed her tenth absence for the year and advised plaintiff that any further absences would result in the continuation of the progressive

---

[1] Dkt. #65 is defendant's statement of undisputed material facts, which was submitted in accordance with Rule 56.1(a) of the Local Rules of Civil Procedure.  Since plaintiff failed to submit "a separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried," as required by Local Rule 56.1(b), plaintiff failed to controvert the defendant's statement of undisputed material facts.    Accordingly, pursuant to Local Rule 56.1(c), defendant's statement of undisputed material facts are "deemed to be admitted" for purposes of ruling on the motion for summary judgment. *See Gubitosi v. Kapica,* 154 F.3d 30, 31 n.1 (2d Cir. 1998); *Ashley v. Eastman Kodak Co.,* 2005 WL 1460168, at *1 (W.D.N.Y. June 21, 2005).  These facts will be supplemented, as warranted, by reference to the underlying documents upon which the statement of undisputed material facts is based.

discipline process up to and including termination.  Dkt. #66-3, p.2.  In the first part of 2001, plaintiff incurred eight unscheduled absences: January 10th, January 11th, January 12th, February 8th, March 3rd, March 15th, March 26th, and March 27th.   Dkt. #66, p.4.  Plaintiff received a verbal warning with respect to these absences on April 3, 2001.  Dkt. #66, p.7.

Effective April 8, 2001, plaintiff successfully bid into a full-time "floater" position, which entailed varied unit and shift assignments depending on the hospital's staffing needs.  Dkt. #65, ¶ 27.  Plaintiff's supervisor was Kathy Fisher, R.N., but she also reported to the Nurse Manager and Charge Nurse on her assigned floor.  Dkt. #65, ¶ 28.

Plaintiff was excused for a disability leave of absence between May 2 and August 7.  Dkt. #65, ¶ 37.  Upon her return to work, plaintiff was assigned to the 11:00 p.m. to 7:00 a.m. shift on Unit 6.  Dkt. #65, ¶ 29.  Fran Hackett, R.N., was the Nurse Manager and Jan Plummer, LPN, was the Charge Nurse for Unit 6.  Dkt. #65, ¶ 30.

Plaintiff was absent from work on September 1st, 6th, 13th, and 15th.  Dkt. #65, ¶ 38.  On October 1, 2001, when Ms. Fisher returned to work following disability leave, she contacted Carolyn McKinney, Director of Human Resources for Long Term Care at Deaconess, who advised that plaintiff should receive the standard discipline set forth in the Time and Attendance Policy, *to wit*, suspension without pay pending administrative review for discharge.  Dkt. #65, ¶ 41; Dkt. #74, ¶ 11.  Plaintiff was not scheduled to work on October 1, 2001.  Dkt. #66-3, p.4.  As plaintiff was completing her night shift on the morning of October 3, 2001, Ms. Fisher informed plaintiff that discipline would be forthcoming.  Dkt. #65, ¶ 42; Dkt. #73, ¶ 7.

Plaintiff reported to work at 11:00 p.m. on October 3, 2001.  Dkt. #65, ¶ 46.  In a statement prepared on October 4, 2001, Jan Plummer recounted that when she asked plaintiff if she had completed second rounds before her break, plaintiff indicated that she had checked the residents she knew would be wet.  Dkt. #66-3, p.13.  When Ms. Plummer explained that plaintiff was required to check each resident on each round, plaintiff told Ms. Plummer that the care plan should be changed.  Dkt. #66-3, p.13.  Between 6:00 a.m. and 6:30 a.m., Ms. Plummer informed Fran Hackett that plaintiff had failed to complete second rounds and had stated that three hour rounds were too much work.  Dkt. #66-3, p.15.

At approximately 6:30 a.m., Ms. Hackett called plaintiff into her office and restated the expectations that plaintiff follow reasonable requests of the Charge Nurse and complete rounds on all residents.  Dkt. #66-3, p.15.  At approximately 6:50 a.m., Ms. Plummer called plaintiff into a resident's room and confronted her about the fact that the resident was still on the same wet bed pad he had been on at 5:15 a.m.  Dkt. #66-3, p.13.  Ms. Plummer called Ms. Hackett into the room, at which point plaintiff became loud and verbally abusive, claiming that Ms. Plummer "set her up" and threatening, "I'll get her . . . I'll get her on sexual harassment."  Dkt. #66-3, pp.13-16.  Plaintiff refused to lower her voice and had to be asked to leave the unit several times.  Dkt. #66-3, p.16.  As a result of this incident, plaintiff received a three day suspension without pay, which she served on October 4th, 5th and 8th.  Dkt. #66-3, p.29.

On October 5, 2001, Ms. Fisher completed a corrective action form with respect to plaintiff's absence on September 1, 2001.  Dkt. #66-3, p.9.

Ms. Fleming telephoned Carolyn McKinney to file a sexual harassment charge late in the afternoon of October 5, 2001.  Dkt. #66-6, p.2.  After a brief conversation about Ms. Fleming's complaint, Ms. McKinney asked Ms. Fleming to provide her with a written statement.  Dkt. #66-2, p.2.  Plaintiff set forth her concerns in

a letter to Carolyn McKinney dated October 5, 2001.  Dkt. #66-3, pp.31-33.  With

respect to the 2:00 a.m. rounds on October 4, 2001, plaintiff reported that Ms. Plummer

accused her of failing to complete second rounds, which she denied, but volunteered to

do again.  Dkt. #66-3, p.31.  About 6:30 a.m., plaintiff states she was called into Ms.

Hackett's office for a discussion about the Care Plan rules.  Dkt. #66-3, p.32.  When

plaintiff asked Ms. Hackett what she had done wrong, Ms. Hackett responded, "You

only have two weeks on my floor, so please get along with Nurse Jan."  Dkt. #66-3,

p.32.  Plaintiff replied:

> I do what she tells me to do.  But since you have me in here,
> I would like to mention some things that Nurse Plumer [sic]
> has been doing to me that I don't approve of and I was
> hoping she would stop.  Since the month of August until the
> end of September, Nurse Plumer [sic] has been making
> sexual advancements towards me.  She would touch me
> inappropriate [sic] for instance she would tickle me on my
> stomach, rub my neck, rub my face, rub my hand and she
> was making me feel very uncomfortable and she would tell
> me about her relationship that she had with this married
> woman and the woman left her and went back to her
> husband and then she proceeded to telling [sic] me how she
> could please a woman and that she carries about one
> hundred fifty dollars to work every day and if I needed
> something to ask her which I never did.  After, [sic] I told
> Nurse Plumer [sic] several times that I don't want to hear
> about her relationship and to please stop making sexual
> advancements to me her attitude changed.

Dkt. #66-3, p.32.  After Ms. Hackett called Ms. Plummer into her office, plaintiff reported

that Ms. Plummer asked plaintiff, "What is it between us?  I am not trying to ride your

back."  Dkt. #66-3, p.32-33.  Plaintiff informed Ms. Plummer that "after I requested you .

. . stop making sexual advancements towards me you changed."  Dkt. #66-3, p.33.

Plaintiff then questioned Ms. Plummer about why Ms. Hackett had called her in to her

office to speak to her about the care plan, and Ms. Plummer walked over to a resident's

room and began yelling, "THIS IS WHY BECAUSE HE HAS ON THREE PADS." Dkt.

#66-3, p.33.  Plaintiff accused Ms. Plummer of trying to set her up, at which point Ms.

Plummer accused plaintiff of lying.  Dkt. #66-3, p.33.  Ms. Plummer left the room to get

Ms. Hackett, who returned and told plaintiff to leave the floor.  Dkt. #66-3, p.33.

On October 9, 2001, plaintiff returned to work following her three-day

suspension with respect to the events of October 3-4, 2001.  Dkt. #66-3, p.4.

On October 24, 2001, a corrective action form was prepared regarding

plaintiff's absence on September 6th.  Dkt. #66-3, p.10.  On October 25, 2001, a

corrective action form advised plaintiff that due to her absence on September 13, 2001,

she was suspended without pay as of October 25, 2001, pending investigation by

Carolyn McKinney.  Dkt. #66-3, p.11.

Ms. McKinney completed her investigation of Ms. Fleming's sexual

harassment allegation on October 30, 2001 and concluded that there was no evidence

to support plaintiff's allegation of being sexually harassed.  Dkt. #66-6, pp. 2-3.  Ms.

McKinney noted that plaintiff admitted in her interview that Ms. Plummer never said

anything personally to her that was of a sexual nature, but simply overheard a personal

conversation between Ms. Plummer and another employee.  Dkt. #66-6, p. 3.  Ms.

McKinney also noted plaintiff's failure to complain prior to the incident of October 4,

2001, despite her allegation that the harassment began in August of 2001; plaintiff's

statement, heard by the Charge Nurse, Head Nurse, and at least one other Certified

Nurses Assistant to the effect that she was "going to get" Ms. Plummer; and the

absence of any corroboration of inappropriate behavior from co-workers who were

interviewed during Ms. McKinney's investigation.  Dkt. #66-6, pp.3-4.

Plaintiff was terminated for excessive absenteeism as of November 5, 2001.  Dkt. #66-6, p.6.  A written grievance claiming termination without just cause in violation of the union contract was filed on plaintiff's behalf on November 5, 2001.  Dkt. #66-6, p.8.  The grievance was denied by Ms. McKinney on January 29, 2002 on the grounds that plaintiff's termination was the result of her violation of the time and attendance policy and that there was no evidence "to support collusion on the part of Management or anyone else to terminate Ms. Fleming's employment." Dkt. #66-6, p.10.

On February 7, 2002, plaintiff filed a charge of discrimination with the EEOC claiming that she "was sexually harassed by my Female supervisor, who would grab and hold my hands without my consent, tickle or attempt to tickle me without my consent, and offer me money."  Dkt. #66-2, p.2.

On June 6, 2002, Ms. McKinney shared a summary of the interview statements obtained during her investigation of plaintiff's sexual harassment allegations with Will Tellado, plaintiff's union representative.  Dkt. #66-6, p.11.

On September 25, 2002, the EEOC determined that plaintiff's allegations were not severe or pervasive enough to establish a hostile work environment and that plaintiff's discharge was due to a legitimate, non-discriminatory reason, *to wit*, time and attendance violations, and issued a right to sue letter.  Dkt. #66-2, pp.12-13.

By letter dated November 6, 2002, defendant's attorney advised Will Tellado, that

> I would still like to explore a settlement of this matter, but I cannot accept the one set forth in your letter to me dated October 15, 2002 for a number of reasons, including, without limitation, that it appears to ignore the point that she was, in fact, in violation of the Time and Attendance Policy beyond the level where termination was warranted.  Furthermore,

her position that this was the result of retaliation on the part of supervisors for her claims of sexual harassment rings somewhat hollow in light of the dismissal of her complaint in this regard.

Dkt. #66-6, p.12.

A settlement agreement executed by plaintiff and Will Tellado on December 23, 2002 states that:

It is hereby agreed, by and between [defendant, Union, and plaintiff] that FMCS Case No. 02-06178 (Termination of Jacqueline Fleming) as well as all underlying grievances are settled as follows:

1. The termination of Ms. Fleming is voided and any reference to the termination in her personnel file will be removed.

2. Grievant will submit a signed resignation from her employment at Deaconess Skilled Nursing Facility effective October 24, 2001. This resignation will be placed in Ms. Fleming's personnel file as a permanent record.

3. Any inquiries regarding Grievant from future potential employers will be answered by only providing the dates of her employment, her job title and the fact that she resigned.

4. Upon receipt of a signed copy of this Agreement along with an executed Letter of Resignation, the employer will process a check made payable to the Grievant in the amount of . . . $5,000.00 . . . .

5. Upon the delivery to JACQUELINE FLEMING of the aforementioned check in the amount of [$5,000.00] parties agree that all issues raised by the Grievant's termination are settled in there [sic] entirety.

Dkt. #66-6, p.14. Plaintiff avers that she read the Settlement Agreement before signing it, but that paragraph 5 was not part of the Settlement Agreement she signed. Dkt. #73, ¶ 12. In her deposition, plaintiff reiterated that she "read the document" before she

-8-

signed it and also stated that she received a copy of the agreement after everyone had signed it.  Dkt. #72, p.60.

Plaintiff commenced this action on December 24, 2002.  Dkt. #1.  Plaintiff received the settlement check on January 20, 2003.  Dkt. #66-6, p.15.  The United States Marshal served the Summons and Complaint by mail on February 5, 2003.  Dkt. #4.

## DISCUSSION AND ANALYSIS

### Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 799 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise."  *Bryant*, 923 F.2d at 982.  A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and
> invoke the appropriate statute.  The [party] must also show,
> by affidavits or as otherwise provided in Rule 56 of the
> Federal Rules of Civil Procedure, that there are specific
> factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

Pursuant to Fed. R. Civ. P. 56(e), affidavits in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Thus, affidavits "must be admissible themselves or must contain evidence that will be presented in an admissible form at trial."  *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454-55 (2d Cir. 1991) (hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in an affidavit).  ____

**Settlement Agreement**

Defendant argues that plaintiff's employment discrimination claims are barred by the settlement agreement.  Dkt. #69, pp.3-6.

Plaintiff responds that her union representative "lured, deceived, and tricked [her] into signing the Settlement Agreement with full knowledge that she had vehemently and consistently insisted that her right to pursue, in federal court, her discharge for time and attendance and sexual harassment claims would be preserved." Dkt. #72, ¶ 12.   In support of this argument, plaintiff refers the Court to her affidavit in support of her motion for appointment of counsel, in which she avers that the union representative assured her that the "signing of the Settlement Agreement would not in any manner affect my federal court action, but, instead, would only affect my Arbitration Hearing."  Dkt. #13, ¶ 6.   Plaintiff asserts that she only intended to settle her claim that her suspension and termination failed to comply with the procedures set forth in the Time and Attendance Policy and that certain absences should not have been charged against her.  Dkt. #73, ¶ ¶ 9-10.

> Plaintiff's paralegal, Roger Hicks, affirms that he
>
> assisted Ms. Fleming in her employment discharge matter which was handled by her former Union . . . by Wilfredo Tellado.  From the outset, and throughout the course of that union proceeding, Mr. Tellado and I communicated and discussed the case via personal meetings, telephone and written communication.

Dkt. #13, ¶ 3.  Mr. Hicks avers that he "was present on several occasions when Ms. Fleming personally communicated to Mr. Tellado, in clear and unequivocal terms, her

desire to pursue her employment discharge claims in federal court" and that he "was also present on several occasions when Mr. Tellado attempted to convince Ms. Fleming to allow the Union (himself) to settle her employment case with her former employer." Dkt. #13, ¶¶ 4 & 5.  Mr. Hicks also affirms that paragraph 5 was not read to him during the course of a telephone conference between he and Mr. Tellado immediately preceding plaintiff's execution of the document.  Dkt. #13, ¶ 8.

Under Title VII, an employee may validly waive a claim of discrimination so long as the waiver is knowing and voluntary.  *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 52 & n.15 (1974); *Bormann v. AT&T Commc'ns., Inc.*, 875 F.2d 399, 402 (2d Cir.), *cert. denied*, 493 U.S. 924 (1989).  The Court of Appeals for the Second Circuit has adopted a totality of the circumstances standard in assessing whether a release is valid, and has enumerated the following non-exhaustive list of factors to be considered:

1. the plaintiff's education and business experience;

2. the amount of time the plaintiff had possession of or access to the agreement before signing it;

3. the role of plaintiff in deciding the terms of the agreement;

4. the clarity of the agreement;

5. whether the plaintiff was represented or consulted with an attorney;

6. whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law;

7. whether an employer encourages or discourages an employee to consult an attorney; and

8.  whether the employee had a fair opportunity to consult
an attorney.

*Bormann*, 875 F.2d at 403.


In the instant case, plaintiff is a Certified Nurses Assistant with a high school diploma and more than a year of education at Bryant and Stratton College, who was represented by her union and also "received substantial assistance" from a paralegal regarding her claims against her employer.  Dkt. #13, ¶ 13; Dkt. #65, ¶ 63.  Negotiations between plaintiff's union representative and her former employer spanned at least three months, with plaintiff and her paralegal advisor each communicating with the union representative.  Dkt. #13, ¶ ¶ 3-5; Dkt. #66-6, pp.12&14.   Plaintiff affirms that she "read the Settlement Agreement prior to signing it" and also consulted with her paralegal advisor before signing the agreement.  Dkt. #13, ¶ ¶ 7, 8, 12; Dkt. #72, p.60.  Plaintiff also testified that she received a copy of the settlement agreement after everyone had signed it.  Dkt. #72, p.60.  As a result of the settlement, plaintiff received $5,000.00.  Dkt. #55-6, p.14.


With respect to the clarity of the agreement, the opening sentence of the settlement agreement states that plaintiff's termination "as well as all underlying grievances are settled . . . ."  Dkt. #66-6, p.14.  It does not necessarily follow, however, that this includes plaintiff's sexual harassment complaint.  Plaintiff's complaint of sexual harassment was initially presented to Carolyn McKinney, Director of Long Term Care at Deaconess, on October 5, 2001 while plaintiff's written grievance claimed termination without just cause in violation of the union contract and was filed on plaintiff's behalf on

November 5, 2001, the date plaintiff was terminated for excessive absenteeism.  Dkt. #66-6, pp.2&8.  Thereafter, plaintiff continued to pursue her discrimination claim by filing a complaint with the EEOC.  Dkt. #66-2, p.2.

Since nothing in the settlement agreement, which was drafted by Kaleida Health, expressly refers to plaintiff's complaint of sexual harassment and this complaint was not initiated by way of a union grievance, there is a question of fact as to whether the settlement agreement encompasses plaintiff's discrimination claim.[2]  This position is further supported by plaintiff's affidavit in support of her motion for appointment of counsel and the affidavit of paralegal Roger Hicks, as well as plaintiff's affidavit claiming procedural violations in the application of the Time and Attendance Policy.  Dkt. ##13 & 73.  Accordingly, it is recommended that defendant's motion for summary judgment dismissing the complaint as barred by the settlement agreement, be denied.

## 42 U.S.C. § 1981

Defendant moves for summary judgment against plaintiff's section 1981 claim on the ground that 42 U.S.C. § 1981 does not apply to sex-based claims.  Dkt. #69, p.6.

42 U.S.C. § 1981 provides, *inter alia*, that, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to . . . the full and equal benefit of all laws and proceedings for the security of persons and

---

[2] This question would not necessarily be resolved even if the Court determined that paragraph 5 was included in the Settlement Agreement at the time it was signed by plaintiff.

property as is enjoyed by white citizens."   Thus, in order to establish a claim pursuant to this statute, plaintiff must allege discrimination based on race.  *Tolbert v. Queens College,* 242 F.3d 58, 69 (2d Cir. 2001); *Keating v. Carey*, 706 F.2d 377, 383-84 (2d Cir. 1983).   Since plaintiff's complaint does not allege any facts to suggest racial discrimination, and plaintiff does not address this portion of defendant's motion for summary judgment, it is recommended that defendant's motion for summary judgment be granted with respect to this claim.


**Title VII of the Civil Rights Act**

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1). Title VII claims are not limited to economic or tangible discrimination, but encompass the entire spectrum of disparate treatment, including claims of discriminatorily hostile or abusive work environments.  *Harris v. Forklift Systems*, 510 U.S. 17, 21 (1993). Moreover, the Supreme Court of the United States has determined "that nothing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex."  *Onacle v. Sundowner Offshore Servs*., 523 U.S. 75, 79 (1998).

In order to succeed on a claim of hostile work environment, plaintiff must demonstrate two things: (1) that the workplace is permeated with discriminatory

intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.  *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002); *see Torres v. Pisano*, 116 F.3d 625, 633 (2d Cir.) ("A plaintiff seeking to recover from an employer for hostile work environment must demonstrate some specific basis to hold the employer liable for the conduct of its employees."), *cert. denied*, 522 U.S. 997 (1997).

An employer will be held liable for harassment perpetrated by one of its supervisors if:

1.   the supervisor was at a sufficiently high level in the company; or

2.   the supervisor used his actual or apparent authority to further the harassment, or was otherwise aided in accomplishing the harassment by the existence of the agency relationship; or

3.   the employer provided no reasonable avenue for complaint; or

4.   the employer knew (or should have known) of the harassment but unreasonably failed to stop it.

*Id.* At 634.   An employer will generally not be liable when a co-employee, as distinct from a supervisor, is alleged to have engaged in harassing activity "unless the employer either provided no reasonable avenue of complaint or knew of the harassment but did nothing about it."  *Quinn v. Green Tree Credit Corp*., 159 F.3d 759, 766 (2d Cir. 1998), *abrogated on other grounds by National R.R. Pass. Corp. v. Morgan,* 536 U.S. 101 (2002).

In the instant case, Jan Plummer's position as Charge Nurse for Unit 6 is not sufficiently high in the hospital hierarchy to impute the allegations of improper conduct to the defendant nor did it endow Ms. Plummer with sufficient authority to aid in any harassment which may have occurred.  In her declaration, Carolyn McKinney, Senior Human Resources Specialist for Kaleida Health's Millard Fillmore Gates Circle Hospitall, explained that the Nurse Manager for Unit 6, Fran Hackett, R.N., was responsible for patient care on the Unit, including ensuring that employees administered care in accordance with applicable policy and procedure.  Dkt. #67, ¶ 23.  Ms. McKinney further declares that Ms. Plummer had no control over the terms and conditions of plaintiff's employment and could not discipline plaintiff.  Dkt. #67, ¶ 23.  Accordingly, when Ms. Plummer was concerned about plaintiff's performance on the evening of October 3, 2001, she informed Ms. Hackett, who counseled plaintiff informally.  Dkt. #66-3, p.15.  Thereafter, it was Ms. Hackett who instituted plaintiff's three-day suspension for insubordinate behavior.  Dkt. #66-3, p.29.  In addition, plaintiff's administrative supervisor, Kathy Fisher, R.N., was responsible for unit and shift assignments for floaters such as plaintiff.  Dkt. #67, ¶ 21.  As part of her responsibilities, Ms. Fisher monitored plaintiff's time and attendance and disciplined plaintiff for excessive absences.  Dkt. #67, ¶ 21.  As a result, it is clear that Ms. Plummer's relationship with plaintiff is far more aligned with that of a co-worker than it is with that of a high-level supervisor.  In addition, there is simply no competent evidence that whatever authority Ms. Plummer did have over plaintiff was used to further her alleged harassment of plaintiff.

With respect to the third circumstance under which an employer can be liable, defendant has proffered sufficient evidence to demonstrate a reasonable avenue for complaints of harassment.  Defendant maintains an Unlawful Employee Harassment Policy and Procedure which evinces "a zero tolerance policy with respect to any form of unlawful harassment," including "sexual harassment," and specifically advises employees that they may report harassment to their supervisor or manager; the site Human Resources Department; the Senior Vice President of Corporate Human Resources, or by filing a grievance in accordance with their collective bargaining agreement.  Dkt. #66, p.85.  Carolyn McKinney affirmed that new employees receive copies of this Policy and Procedure and that it is specifically discussed during orientation.  Dkt. #67, ¶ 11.  Ms. McKinney further affirms that "employees continue to be informed during their employment about the EEO and anti-harassment policies and their opportunity/responsibility to report instances of discrimination and/or harassment."  Dkt. #66, ¶ 11.  Plaintiff does not dispute this evidence.

Finally, plaintiff has not suggested that defendant knew or should have known of the alleged harassment, but failed to remedy it.  Although plaintiff's affirmation in opposition to defendant's motion for summary judgment states that she "made complaints to numerous union and Deaconess Staff personnel about such incidents of harassment to no avail," that statement is devoid of any specifics, *to wit*, whom she spoke to and when.  Dkt. #73, p.2.  Accordingly, the Court relies upon plaintiff's letter to Ms. McKinney, dated October 5, 2001, which demonstrates that plaintiff first complained about Ms. Plummer to Ms. Hackett on the morning of October 4th.  Dkt.

#Dkt. #66-3, p.32.  Plaintiff's deposition testimony further confirms that she first raised the issue of Ms. Plummer's behavior to Ms. Hackett on the morning of October 4th.  Dkt. #66-2, pp.55, 59.  With respect to the suggestion of a union complaint, plaintiff testified at her deposition that she called her union representative at some point during the October 3rd through October 4th shift and was planning on complaining to the union when she got off her shift that morning.  Dkt. #66-2, pp.59-60, 72.  Plaintiff's deposition testimony suggests that the union told her to raise her complaint with Carolyn McKinney.  Dkt. #66-2, pp. 81-82.  Thus, the record demonstrates that plaintiff's initial report occurred on October 4, 2001 to Ms. Hackett and was followed by her written complaint to Ms. McKinney dated October 5, 2001.  Ms. McKinney commenced a detailed investigation immediately after being informed of the allegations against Ms. Plummer.  Dkt. #66-6, pp.2-3.  Accordingly, it is recommended that defendant's motion for summary judgment be granted on the ground that, even assuming a question of fact as to whether Ms. Plummer's conduct created a hostile work environment for plaintiff, there is no basis to impute her conduct to the defendant.

**Retaliation**

The defendant argues that plaintiff cannot establish that her termination for violation of the Time and Attendance Policy was in retaliation for her complaint of sexual harassment because plaintiff incurred more absences than the policy permits prior to her complaint.  Dkt. #69, p.16.

Plaintiff argues that she was not disciplined until after she complained of sexual harassment.  Dkt. #72, p.9.

 In order to establish a *prima facie* case of retaliation, the plaintiff must show: (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).  Complaining of discrimination to one's supervisor constitutes protected activity.  *Id.*  The causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.  *See Feingold v. New York*, 366 F.3d 138, 156-57 (2d Cir. 2004).  "Where timing is the only basis for a claim of retaliation," however, "and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise."  *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 94 (2d Cir.), *cert. denied*, 534 U.S. 951 (2001).

As of September 15, 2001, plaintiff had incurred twelve unscheduled absences from work during the course of 2001.  She was aware of the potential consequences of such absences by virtue of having received a written warning after incurring ten absences in 2000, which advised her that additional absences would result in the continuation of the progressive discipline process up to and including termination.  Dkt. #66-3, p.2.  This written warning was administered prior to plaintiff's transfer to Unit 6.  Dkt. #65, ¶ 30.  After incurring eight unscheduled absences in 2001, plaintiff was

counseled again on April 3, 2001 and warned that the next absence would result in a written warning, yet incurred additional unscheduled absences on September 1st, 6th, 13th, and 15th.   Dkt. #66, pp.4&7.  This verbal warning was also administered prior to plaintiff's transfer to Unit 6.  Dkt. #65, ¶ 27.  Moreover, plaintiff's supervisor had already received permission to continue the progressive discipline as of October 1, 2001, and plaintiff concedes that Ms. Fisher informed her on the morning of October 3, 2001 that discipline for the September absences would be forthcoming .  Dkt. #65, ¶ 33; Dkt. #73, ¶ 7.  Thus, there is no evidence to suggest a causal connection between plaintiff's complaint and her termination, which was the culmination of an established disciplinary program for unscheduled absences.  Accordingly, it is recommended that defendant's motion for summary judgment be granted with respect to plaintiff's claim of retaliation.

## **<u>CONCLUSION</u>**

Based on the foregoing, it is recommended that the defendant's motion for summary judgment (Dkt. #64), be **GRANTED**.


Accordingly, pursuant to 28 U.S.C. § 636(b)(1), it is hereby


ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.


ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this

Report, Recommendation and Order in accordance with the above statute,

Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).


The district judge will ordinarily refuse to consider *de novo* arguments,

case law and/or evidentiary material which could have been, but was not presented to

the magistrate judge in the first instance.  *See, e.g., Patterson-Leitch Co. v.*

*Massachusetts Mun. Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988).


Failure to file objections within the specified time or to request an

extension of such time waives the right to appeal the District Court's Order.  *Thomas v.*

*Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.*,

838 F.2d 55 (2d Cir. 1988).


The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local

Rules for the Western District of New York, "written objections shall specifically identify

the portions of the proposed findings and recommendations to which objection is made

and the basis for such objection and shall be supported by legal authority."  Failure to

comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of

Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report,

Recommendation and Order), may result in the District Judge's refusal to consider the

objection.

The Clerk is hereby directed to send a copy of this Order and a copy of the Report and Recommendation to counsel for the parties.


**SO ORDERED.**


DATED:      Buffalo, New York
            March 10, 2006


                                    S/ H. Kenneth Schroeder, Jr.
                                    **H. KENNETH SCHROEDER, JR.**
                                    **United States Magistrate Judge**